**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOBBY CARTER, | ) | CASE NO. 1:16-cv-01840 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Bobby Carter (hereinafter "Plaintiff"), challenges the final decision of
Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter
"Commissioner"), denying his application for Supplemental Security Income ("SSI") under Title
XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. ("Act"). This court has jurisdiction
pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate
Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and
Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the
Commissioner's final decision be AFFIRMED.

## I. Procedural History

On September 20, 2013, Plaintiff filed his applications for SSI, alleging a disability onset date of September 5, 2013. (Transcript ("Tr.") 149-154). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 100-111). Plaintiff participated in the hearing on July 7, 2015, was represented by counsel, and testified. (Tr. 37-63). A vocational expert ("VE") also participated and testified. *Id.* On July 29, 2015, the ALJ found Plaintiff not disabled. (Tr. 25). On June 23, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-3). On July 21, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 12 & 14).

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly apply the treating physician rule; and (2) the ALJ erred by rejecting the psychological evaluations of the State Agency doctors. (R. 12).

## II. Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in August of 1981 and was 32-years-old on the alleged disability onset date. (Tr. 23). He had a limited education and was able to communicate in English. (Tr. 23). He has no past relevant work. *Id.*

**B. Relevant Medical Evidence[1]**

**1. Treatment Records**

On April 5, 2011, Plaintiff was seen at Connections.[2] (Tr. 242-253). It was noted that Plaintiff was 29 years old, had five daughters, and he was unemployed. (Tr. 243). Plaintiff reported symptoms of depression, that he had been prescribed medication by Cleveland Clinic doctors, and that he had never received mental health service. *Id*. He reported having one friend, that he completed the tenth grade, but that he had no history of learning difficulties or barriers to learning. (Tr. 243-244). He reported having abused alcohol and illegal drugs within the past twelve months. (Tr. 245).

On November 11, 2012, Plaintiff presented to the ER indicating that he had an alcohol problem. (Tr. 389). Plaintiff reported drinking 3-4 bottles of liquor every day. *Id*.

On May 13, 2013 and May 17, 2013, Plaintiff was seen in an emergency department where he was diagnosed with an anxiety attack, prescribed Lorazepam and Paroxentine, and released the same day or the following day. (Tr. 362-363, 367-369, 371-372).

On May 9, 2014, Plaintiff was seen by Lynn M. Pattimakiel, M.D., after last being seen by her on January 25, 2012.[3] (Tr. 961). His "chief complaint" was that he wanted a "medical form to be filled." *Id*. With respect to mental impairments, Dr. Pattimakiel recorded Plaintiff's self-

---

[1]  Because Plaintiff's assignments of error revolve entirely around the opinions of several treating and non-treating sources concerning Plaintiff's mental abilities, the court focuses primarily on these opinions and intentionally omits any discussion of Plaintiff's physical conditions.

[2]  The form appears to be unsigned, and it is unclear whether it was completed by a medical source. (Tr. 243-253).

[3]  The January 25, 2012 doctor's visit only references complaints with respect to Plaintiff's back and knee pain. (Tr. 346-349). No mental health treatment is mentioned. *Id*.

stated "history of present illness" as follows:

> Pt reports has not been able to work for many years due to uncontrolled
> anxiety/depression
> He is more irritable/and it is difficult for him to get along with others in the work
> environment
> He often feels like isolating himself
> He suffers from intermittent panic attacks
> Reports that he has gone through many traumas in his life-with deaths of loved
> ones/foster care/financial issues
> Reports more memory and concentration skills
> Reports that he is unable to maintain a job due to his condition
>
> Recently able to afford Paxil-and has started this again
> Has not established with Psychiatry

(Tr. 961). On physical examination, Plaintiff had a low effect, was in no acute distress, was alert

and oriented, well-groomed, there was prominence/tenderness over the right zygomatic process,

had no edema, and normal gait. (Tr. 963). Dr. Pattimakiel diagnosed anxiety, depression, low

back pain, and hypertension. (Tr. 963-964). She noted Plaintiff had recently been restarted on

Paxil and the treatment plan included a consult with a psychiatrist. (Tr. 964).

On October 14, 2014, Plaintiff went to the ER and complained of hearing voices,

depression, not sleeping at night, and trouble getting along with others. (Tr. 908). He had

recently been released from county jail, and had a history of domestic violence. *Id.* On

mental status exam, Plaintiff was adequately groomed; his behavior was withdrawn, agitated,

guarded; he was oriented x 3; his speech was clear, normal rate and flow, and slow; his thought

process was logical; association was tight; no abnormal processes noted, "no derailment or

disorganized thoughts of psychotic nature, no spontaneous speech of delusional nature,

expressed feelings of agitation, expressed ideas of reference, expressed paranoid ideation,

positive auditory hallucination, positive visual hallucination," judgment and insight were fair; his

memory was good with recent and remote recall; attention span and concentration were

sustained; his language was appropriate; his fund of knowledge "okay;" his mood depressed, guilty, irritable, anxious, and sad; and his mood was incongruent. (Tr. 912). He was assigned a Global Assessment of Functioning ("GAF") score ranging from 41-50.[4]

On October 20, 2014, Plaintiff was seen by Anela Jyoti, M.D., who noted that Plaintiff had "no consistent prior outpatient psychiatric history except for his trial on psychotropic meds while incarcerated." (Tr. 915). Plaintiff reported been feeling depressed for many years, since his father passed away. *Id.* On mental status examination, Plaintiff was well-groomed, his behavior cooperative, he was oriented x 3, his speech was clear, he had logical thought process with tight association but did express paranoid ideation, his insight and judgment were fair, recent and remote memory were adequate, attention span and concentration were sustained, his language was appropriate, his fund of knowledge was "okay," his affect was constricted, and his mood was irritable, anxious, angry, frustrated, and sad. (Tr. 19).

On February 20, 2015, Plaintiff was seen by Gabriela Feier, M.D. (Tr. 949-951). Plaintiff's subjective complaints included feeling depressed, isolated, and anxious. (Tr. 949). He indicated he had difficulty remembering things and not getting along well with others. *Id.* He was living with his girlfriend, stated he was currently sober, enjoyed fishing and playing basketball, and had good support from his sister and mother. *Id.* On objective mental status

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning. *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) ("DSM-IV"). An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments. A GAF score between 41 and 50 indicates serious symptoms, and such an individual may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job. *See* DSM IV at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

examination, Dr. Feier noted the following: Plaintiff was adequately groomed; his behavior was cooperative; he was oriented x 3; his speech was spontaneous with normal rate and flow; his thought process logical and organized; his thought content and perception showed no evidence of paranoia, delusions, or perceptual disturbance; his mood was depressed/anxious; his affect constricted; and his judgment and insight were fair. (Tr. 950).   With respect to memory. Dr. Feier noted that Plaintiff reported difficulties. *Id*. Plaintiff was diagnosed with mood disorder not otherwise specified ("NOS") and post-traumatic stress disorder ("PTSD"). *Id*.

### 2.   Medical Opinions Concerning Plaintiff's Functional Limitations

On June 9, 2011, J. Joseph Konieczny, Ph.D., performed a psychological evaluation of Plaintiff at the request of the State Agency. (Tr. 292-296). Plaintiff arrived to his evaluation with his girlfriend and her son using public transportation. (Tr. 292). He had never married, but had four children from two relationships. *Id*. He was irritable throughout the evaluation, responded to all questions asked, and was occasionally vague in his presentation. *Id*. Plaintiff reported dropping out of high school during the tenth grade, and repeating two grades. *Id*. Plaintiff had previously been convicted of carrying a concealed weapon and drug charges. (Tr. 293). He reported heavy past use of alcohol and continuing regular consumption. *Id*. On mental status examination, Dr. Konieczny observed that Plaintiff "showed no difficulties in movement or walking, but did verbalize complaints of back pain and pain in his right knee," and "show[ed] some indications of undue impulsivity which appeared to reflect his irritability." *Id*. Plaintiff reported significant difficulties in controlling his temper and also reported episodes of mood swings, and his "level of motivation and participation throughout the evaluation seemed questionable and reflective of his presentation." *Id*. Plaintiff spoke reasonably well and was quite capable of expressing himself in a clear and coherent manner; maintained appropriate eye

contact; was oriented x 3; had marked deficits in his general fund of information; was unable to perform serial threes; had no deficits in logical abstract reasoning; and had poor insight and judgment. (Tr. 294). With respect to activities of daily living, Plaintiff reported waking up at 9 a.m., dressing only if he is going out of the house, watching television and "just sitting out," performing household chores; and occasionally going fishing. *Id*. He reported minimal involvement with outside social activities and having no friends. *Id*. He can perform simple cooking tasks, but his girlfriend does the majority of the cooking. *Id*. Dr. Konieczny diagnosed depressive disorder NOS, personality disorder NOS, possible alcohol abuse or dependence, and assessed a GAF score ranging from 44-52.[5] (Tr. 295-296). Dr. Konieczny indicated that Plaintiff was significantly impaired in his ability to understand, remember, and carry out directions due to marked deficits in his general fund of information, low motivation, and poor effort; markedly impaired in his ability to maintain attention, concentration, and persistence in single and multi-step tasks due again to intellectual limitations and poor effort; was significantly impaired in his ability to respond appropriately to supervision and co-workers in a work setting due to a "very low tolerance for frustration and very poor coping skills," and quite limited in his ability to respond to pressure in the work setting again due to low motivation and intellectual limitations. (Tr. 295).

On November 20, 2013, David House, Ph.D., performed a psychological evaluation of Plaintiff at the request of the State Agency. (Tr. 748-755). Dr. House indicated that Plaintiff's long and short-term memory was reduced and it was "unlikely" he could carry out instructions, and that his concentration was reduced also rendering it "unlikely" that Plaintiff could follow

---

[5] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM IV at 34.

multistep instructions. (Tr. 754). When asked to describe Plaintiff's abilities to respond appropriately to supervision and cope with co-workers in a work setting, Dr. House referenced Plaintiff's self-described social isolation, but did not believe Plaintiff satisfied the diagnostic criteria for a schizoid personality. (Tr. 755). Dr. House opined Plaintiff's coping skills and emotional resources were highly reduced, resulting in Plaintiff being dysfunctional and disruptive in a work environment. *Id.* Dr. House diagnosed mood disorder, PTSD, personality disorder, and assigned a GAF score of 42. *Id.*

On December 4, 2013, State Agency physician Leslie Rudy, Ph.D., reviewed the medical records and completed a mental RFC assessment. (Tr. 75-77). She found that Plaintiff was not significantly limited in his ability to do the following: remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in close proximity to others; ask simple questions or request assistance; maintain socially appropriate behavior; be aware of normal hazards; or, use public transportation. (Tr. 75-76). He was moderately limited in his ability to do the following: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; make simple work-related decisions; complete a normal workday or workweek without interruption from psychologically based symptoms and perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. *Id.* Her opinion was based on Plaintiff's "task completion and participation at [the] CE [consultative examination]," which showed that

he could understand 1-4 step tasks, could concentrate sufficiently to complete simple 1-2 step tasks, and that his relationships demonstrate the ability to interact on an occasional, superficial basis. *Id*.

On February 22, 2014, State Agency physician Carl Tischler, Ph.D., reviewed the medical records and completed a mental RFC assessment. (Tr. 91-93). His findings mirrored those of Dr. Rudy. *Id*.  Noting inconsistent statements by Plaintiff during the consultative exams of Drs. House and Konieczny, Dr. Tischler found Plaintiff only partially credible. He ascribed great weight to the body of Dr. House's report, but noted that Dr. Konieczny's statements were made two years earlier. (Tr. 90).

On May 9, 2014, the same day Plaintiff was seen by Dr. Pattimakiel after a more than two year hiatus, Dr. Pattimakiel completed a check-the-box medical source statement concerning Plaintiff's mental capacity.[6] (Tr. 784-785). Dr. Pattimakiel's notes indicate that she "filled out psychiatric evaluation by obtaining direct responses from patient." (Tr. 963). She also pointed out that: "I have not had any recent direct observation or interaction with patient for clinical assessment." (Tr. 964).  The form completed by Dr. Pattimakiel based on these responses states that Plaintiff would *rarely* be able make the following occupational adjustments: follow work rules; maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to co-workers; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; deal with work stress; complete a normal workday and workweek

---

[6] Dr. Pattimakiel noted Plaintiff was last seen by her and a resident on January 25, 2012. (Tr. 961).

without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out detailed but not complex job instructions; socialize; behave in an emotionally stable manner; relate predictably in social situations; and manage funds/schedules.[7] (Tr. 784-785). Dr. Pattimakiel indicated that she had been treating Plaintiff since December 14, 2011. (Tr. 785). The assessment contained no explanation, save for a statement that it was supported by "uncontrolled anxiety and depression." *Id.*

**C.  Relevant Hearing Testimony**

At the July 7, 2015 hearing, Plaintiff testified as follows:

- He was 33-years old and was kicked out of school in the 11th grade. (Tr. 45-46). He was unsuccessful in his attempts to obtain a GED. (Tr. 46).

- He lives with his girlfriend and her two children. (Tr. 46-47). He has children of his own who live with their mother. He has a good relationship with them, but he does not ever take care of them or babysit them due to his irritability issues. (Tr. 47-48).

- He last worked in 2008. He left the job after getting into an altercation with his boss who wanted him to do more work. (Tr. 48-49).

- When he becomes frustrated or mad, he snaps and lashes out and "will throw some or punch something …" (Tr. 50).

- He has been seeing a counselor and was prescribed medication. He also tries to meditate. He attributes his anger to being molested and assaulted by family members when he was younger. (Tr. 51). He does not experience side effects from his medications, save for Seroquel and the muscle relaxers which make him drowsy. *Id.* He sees a psychiatrist and a case manager. (Tr. 54).

- He would have difficulty taking direction from a supervisor, even if asked to do things that were within his physical capabilities. (Tr. 52). He does not like people telling him what to do. (Tr. 53).   He would "flip out" if his work were criticized. *Id.*

---

[7] The form defines "rarely" as an "activity [that] cannot be performed for any appreciable time." (Tr. 784).

- He uses a cane every now and then, but tries to walk without it to build strength. (Tr. 53).

- He spends a lot of time at home, staying in his room or playing videogames. (Tr. 54-55). He only briefly goes outside. *Id.*

The ALJ posed the following hypothetical question to the VE:

> Let's assume an individual who's limited to medium work, who can frequently climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds, can occasionally kneel, crouch, or crawl. They can perform simple tasks in a setting with occasional changes. They can occasionally interact with supervisors, coworkers, and the public, if that interaction is limited to speaking and signaling. Are there any jobs in the economy that this person could perform, and if so, could you give me a few examples?

(Tr. 57-58).

The VE testified that such an individual could perform a number of jobs and identified the following as examples: kitchen helper, Dictionary of Occupational Titles ("DICOT") 318.687-010, medium, unskilled, with an SVP of 2 (3,500 jobs locally, 20,000 in Ohio, 500,000 nationally); cleaner II, DICOT 919.687-014, medium, unskilled, with an SVP of 2 (2,000 jobs locally, 12,000 in Ohio, 300,000 nationally); laundry worker II, DICOT 361.685-018, medium, unskilled, with an SVP of 2 (1,500 jobs locally, 8,000 in Ohio, 200,000 nationally). (Tr. 58).

The ALJ posed a second hypothetical question to the VE: "Now for the second hypothetical, I would like you to consider the same person, this person is limited to sedentary." (Tr. 59). The VE responded by identifying the following jobs as examples that the hypothetical person could perform: final assembler, DICOT 713.687-018, sedentary, unskilled, with an SVP of 2 (1,500 jobs locally, 6,000 in Ohio, 100,000 nationally); lens inserter, DICOT 713.687-026, sedentary, unskilled, with an SVP of 2 (1,200 jobs locally, 6,000 in Ohio, 100,000 nationally); and table worker/sorter, DICOT 739.687-182, sedentary , unskilled, with an SVP of 2 (1,200 jobs locally, 5,000 in Ohio, 100,000 nationally). (Tr. 59-60). The VE stated his testimony was

consistent with the DICOT. (Tr. 59, 60).

The ALJ posed a third and fourth hypothetical to the VE asking him to consider an individual who would be off-task 20 percent of the time and an individual who will be absent twice a month on an ongoing basis. (Tr. 60). The VE responded that either scenario would render the hypothetical individual unemployable. (Tr. 60-61).

In response to a question posed by Plaintiff's counsel, the VE testified that an individual who was limited to 1 to 2 step instructions *and* had to be redirected on an occasional basis day in and day out was unemployable. (Tr. 61) Similarly, a person who would be disruptive to supervisors and co-workers twice a day and who would not accept supervision was also unemployable. (Tr. 62).

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 404.1505 & 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); 404.1509 and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a medically determinable

"severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g) and 416.920(g), 404.1560(c).

## IV.   Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 5, 2013, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: status post right knee surgeries; L5/S1 disc extrusion; degenerative spurring, cervical spine; mood disorder; posttraumatic stress disorder (PTSD); substance abuse disorder; personality disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except: he can frequently climb ramps or stairs;

he can occasionally climb ladders, ropes or scaffolds; he can occasionally kneel, crouch or crawl; he can perform simple tasks in a setting with occasional changes; he can occasionally interact with supervisors, coworkers and the public, if that interaction is limited to speaking and signaling.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on August 27, 1981 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a "limited" education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since September 5, 2013, the date the application was filed (20 CFR 416.920(g)).

(Tr. 18-24).

## V.   Law and Analysis

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.

*Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B. Plaintiff's Assignments of Error**

**1. Weight Assigned to Dr. Pattimakiel**

In the first assignment of error, Plaintiff asserts the ALJ erred by assigning little weight to the May 9, 2014 opinion of Dr. Pattimakiel, whom he characterizes as a treating source. (R. 12, PageID# 1141-1144). The Commissioner challenges Plaintiff's assertion that Dr. Pattimakiel was a treating source as defined by the regulations, arguing that she only saw Plaintiff on two occasions several years apart at the time of the May 9, 2014 opinion. (R. 14, PageID# 1160-1161). Under Social Security regulations, a "treating source" is defined as follows:

> Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for

disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. § 416.927(a)(2).[8]

First, it is significant that the ALJ himself did not specify that he considered Dr. Pattimakiel a treating source, but referred to her opinion as merely a "medical source statement." (Tr. 23). Plaintiff points to no evidence suggesting this finding was unreasonable. Moreover, the court agrees with the Commissioner that two documented visits by Plaintiff do not establish the kind of longitudinal relationship that underpins the deference accorded to treating physician's opinions. *See* 20 C.F.R. § 416.927(c)(2) ("we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, *longitudinal* picture of your medical impairment(s)") (emphasis added). In *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485 (6th Cir. 2005), the Sixth Circuit found as follows:

> Daniels next argues that Dr. Pinson's opinion was not afforded deference by the ALJ…. Dr. Pinson testified that she treated Daniels on two occasions…. The ALJ's opinion referred, in passing, to Dr. Pinson as a treating source or treating physician, thus adopting Daniels's own characterization of Dr. Pinson…. We conclude that the treating source regulations and *Wilson* are not implicated by the

---

[8] Pursuant to new regulations effective as of March 27, 2017, 20 C.F.R. §§ 404.1527 & 416.927 set forth the rules for evaluating opinion evidence, both medical and nonmedical, for claims filed *before* that date.  Conversely, 20 C.F.R. §§ 404.1520c & 416.920c set forth the rules for evaluating such evidence for claims filed *on or after* March 27, 2017. The latter regulations, not applicable to the present case, eliminate the term "treating source," as well as what is customarily known as the "treating source rule." *See also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 81 FR 62560 at 62573-62574 (Sept. 9, 2016) ("we would no longer give a specific weight to medical opinions … this includes giving controlling weight to medical opinions from treating sources … [and] [w]e would not defer or give any specific evidentiary weight, including controlling weight, to any … medical opinion, including from an individual's own healthcare providers.") Rather, for cases filed prior to the effective date, the Social Security Administration "will continue to apply [its] current rules for evaluating evidence from a treating source …." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844 at 5861 (Jan. 18, 2017).

facts of this case. The ALJ's failure to specifically address Dr. Pinson's opinion, despite casually referring to her as the treating source, is not surprising given that ***Dr. Pinson does not meet the criteria under the regulations to be defined as a treating physician***. The regulations define a treating physician as a physician who has provided medical treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the claimant. 20 C.F.R. § 404.1502. The Commissioner will consider a claimant to have an ongoing treatment relationship when "the medical evidence establishes that [the claimant] see[s], or has seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.* A physician who has treated a patient only a few times may be considered a treating source if that frequency of visits is appropriate for the claimant's medical condition. *Id.* In this case, Dr. Pinson saw Daniels on two occasions, November 13, 2001, and November 16, 2001…. Daniels's two visits to Dr. Pinson within the span of a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many other occasions.

*Daniels*, 152 Fed. App'x at 489-91 (footnotes omitted) (emphasis added). The pertinent issue is whether there was an on-going relationship to qualify as a treating physician, and "two or three visits often will not suffice for an ongoing treatment relationship[,]" with some possible exceptions depending on the circumstances and nature of the person's underlying medical condition. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006); *Hickman v. Colvin*, No. 1:13cv00089, 2014 WL 2765670 at *12 (M.D. Tenn. June 18, 2014) ("Precedent in this Circuit suggests that a physician who treats an individual only twice or three times does not constitute a treating source."); *see also Taylor v. Astrue*, 245 Fed. App'x 387, 391 (5th Cir. 2007) (two visits to doctor did not establish a treating relationship).

An infrequent treatment history is arguably even more significant when it comes to psychiatric care. *See e.g., Smith v. Astrue*, No. 4:11-cv-0863, 2012 WL 946852 at *6 (N.D. Ohio Mar. 20, 2012) (White, M.J.) ("Two psychiatric visits only one month apart were insufficient to establish a treating relationship, as it is not a frequency consistent with the longitudinal nature of psychiatric treatment"); *accord East v. Comm'r of Soc. Sec. Admin.*, No.

1:13-CV-1479, 2014 WL 3828433 at *11 (N.D. Ohio Aug. 4, 2014) (McHargh, M.J.).

Plaintiff's two visits to Dr. Pattimakiel, more than two years apart, is even less suggestive of a treating relationship than some of the above cited cases. Further, it is not entirely clear from the record that Dr. Pattimakiel ever treated Plaintiff for his mental health issues, referring him for a psychiatric consult instead and focusing primarily on his physical issues. (Tr. 346-349, 961-964). Due to the sparse and sporadic evidence of treatment by Dr. Pattimakiel contained in the record, the ALJ was not required to consider her opinion as coming from a treating source.

The opinion of a non-treating but examining source is not subject to the rigors of the treating physician rule. Other courts have determined that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." Williams v. Colvin, 2015 WL 5165458 at *5 (N.D. Ohio, Sept. 2, 2015) (citing Kornecky v. Comm'r of Soc. Sec., 167 Fed. App'x 496 (6th Cir. 2006); accord Chandler v. Comm'r of Soc. Sec., 2014 WL 2988433 at *8 (S.D. Ohio, July 1, 2014) ("the ALJ is not required to give 'good reasons' for rejecting a nontreating source's opinions in the same way as must be done for a treating source"). While a claimant may disagree with the ALJ's explanation as to why little weight was assigned to a non-treating medical source, such a disagreement with the ALJ's rationale does not provide a basis for remand. See, e.g., Steed v. Colvin, 2016 WL 4479485 (N.D. Ohio Aug. 25, 2016) (McHargh, M.J.).

The ALJ offered the following assessment of Dr. Pattimakiel's May 2014 opinion:

> The undersigned considered the May 2014 medical source statement completed by internist, Dr. Pettirakiel [sic][9], on which were checked numerous boxes

---

[9] The ALJ's decision incorrectly spelled Dr. Pattimakiel's name, but such spelling does not alter the substance of the ALJ's assessment.

indicating the claimant had no useful abilities in such areas as following work rules, maintain attention and concentration, responding to changes in routine settings, maintaining regular attendance, dealing with others, completing a normal work schedule, behaving in an emotionally stable manner, etc. (Exhibit 20F). Dr. Pettirakiel listed symptoms, and no specific clinical abnormalities in support of her appraisal. Indeed, the clinician wrote that she completed the evaluation report "by obtaining direct responses from patient" (See; Exhibit 26F p.3). The narrative of Dr. Pettirakiel's examination of the claimant discussed earlier, was cursory and contained no meaningful objective findings. Little weight is accorded the assessment of Dr. Pettirakiel, which amounts to a recitation of the claimant's subjective complaints and self-reported limitation.

(Tr. 23).

Plaintiff's brief takes issue with this explanation, claiming that the there was "no basis" for the conclusion that Dr. Pattimakiel was simply reiterating Plaintiff's subjective complaints. (R. 12, PageID# 1141). The court finds this argument lacks merit, given the decision directly quotes from Dr. Pattimakiel's notes that she "filled out [the] psychiatric evaluation by obtaining direct responses from patient." (Tr. 963, Exh. 26F at p. 3). The ALJ interpreted this statement as an indication that the May 2014 assessment did not reflect Dr. Pattimakiel's own opinions or observations, but rather those of the Plaintiff. The court finds no fault with this entirely reasonable interpretation of the record. In fact, while this court does not conduct a *de novo* review or reweigh the evidence, it would be hard-pressed to ascribe any other interpretation to the above notation after reviewing the record and the pertinent medical source statement form. (Tr. 784-85, 961-64).[10] The ALJ's conclusion is buttressed by Dr. Pattimakiel's notation on the following page of medical records, wherein she indicated that she had "not had any recent direct observation or interaction with patient for clinical assessment." (Tr. 964). Given the lack of any recent observation or interaction, the ALJ did not commit error in determining that the May 2014

_____

10 The pertinent medical record further indicates that Plaintiff presented with a "Chief Complaint…for medical form to be filled." (Tr. 961).

medical source statement cannot have been the product of Dr. Pattimakiel's own professional opinion. In addition, the ALJ also correctly noted that the May 2014 assessment gave no explanation or support for the opinions therein, other than an indication that Plaintiff had uncontrolled anxiety and depression. (Tr. 784-785). The court finds the ALJ sufficiently explained the weight ascribed to the purported opinion of a non-treating source.[11]

Therefore, the court finds the first assignment of error meritless.

### 2. Weight Assigned to Consultative Examiners

In the second assignment of error, Plaintiff asserts the ALJ erred by failing to explain why he discredited the opinions of consultative examiners Drs. House and Konieczny. (R. 12, PageID# 1144-1146).

An ALJ, when arriving at the RFC assessment, "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184 at *7 (July 2, 1996); *see also* *Puckett v. Colvin*, 2014 WL 1584166 at *9 (N.D. Ohio April 21, 2014) (Vecchiarelli, M.J.) (explaining that, although the ALJ was *not* required to evaluate opinions of consultative examiners with the same standard of deference as would apply to an opinion of a treating source, he was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and explain why he did not include their limitations in his determination of Plaintiff's RFC").

_____

11 While the court does not believe Dr. Pattimakiel was a treating source as defined by the regulations, the explanation provided by the ALJ, under the circumstances of this case, would have constituted a good reason for rejecting the May 2014 assessment. The ALJ's finding, that the opinions therein were not actually the opinions of Dr. Pattimakiel but of the Plaintiff, was well-supported by the record.

First, Plaintiff suggests that "[w]hen evaluating the opinion of an examining or consulting physician, the ALJ must apply the same level of scrutiny as used to assess the opinion of treating physicians." (R. 12, PageID# 1144). Plaintiff's assertion is incorrect, and his citation to *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379 (6ᵗʰ Cir. 2013) misconstrues that court's holding. The *Gayheart* court was confronted with a materially different set of facts. There, the ALJ ascribed little weight to a treating psychiatrist after rigorously scrutinizing her opinion, while crediting the opinions of several consultative examiners without addressing inconsistencies in their opinions. *Id.* at 376-379. The Sixth Circuit observed that "[a] more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Id.* at 379. While it is true that all medical opinions, regardless of the source, are evaluated using the same factors, 20 C.F.R. § 416.927, that does not mean an ALJ must comply with the treating physician rule and articulate "good reasons" for rejecting the opinion of a non-treating source such as Dr. House or Dr. Konieczny. S*ee cases cited in Section B-1, supr*a.

Here, the ALJ addressed the opinions of Drs. Konieczny and House as follows:

> Little weight is assigned to the 2011 views of J. Konieczny, Ph.D. (Exhibit 3F), a consultative examiner involved in the claimant's prior and administratively final unsuccessful petition for benefits; and to the opinion of consultative examiner, House. The clinicians believed the claimant had significant impairment related to the ability to understand, remember and carry out directions; maintain attention and concentration; responding appropriately to others, and dealing with work setting pressure. The claimant mislead Dr. House informing that he never abused alcohol (Exhibit 16F p.4), an assertion contradicted by the record. The claimant further informed he last worked in 2008, yet he asked a health professional during March 2013 to provide "a work note for my job" after allegedly twisting his knee while working (Exhibit 6F p.56). The undersigned does not find the opinions of the consultative examiners to be well supported objectively, or to be consistent with the record as a whole.

***

> Great weight is assigned to Administrative findings of fact [that] were made by nonexamining Disability Determination Service (DDS) physicians and consultants. The DDS delineated subjective complaints, daily activities, clinical and diagnostic study findings, in concluding the claimant had a medically determinable "severe" impairments, and retained the capacity to perform a range of simple and routine medium work on a sustained basis, which did not involve frequent interpersonal interactions. This viewpoint is well founded, and is consistent with a preponderance of the evidence.

(Tr. 23).

Reading the decision as a whole, the ALJ sufficiently explained why he was giving little weight to the consultative examiners. Admittedly, the explanation could have been more thorough, but the explanation requirement is not as rigorous as the "good reasons" requirement of the treating physician rule. *See, e.g.,, Moscorelli v. Colvin*, No. 1:15cv1509, 2016 WL 4486851 at **3-4 (N.D. Ohio Aug. 26, 2016) (Lioi, J.) (observing that a "thin" explanation that would not constitute a 'good reason' for discounting a treating source's opinion may, nevertheless, satisfy the explanation requirement for a non-treating source). First, the ALJ explained that the opinions were not well supported objectively and were inconsistent with the record as a whole. Second, the ALJ plainly found the opinions of Drs. Rudy and Tischler more persuasive, and consistent with the evidence. Typically, more weight is given to the opinion of an examining versus non-examining source. *See* 20 C.F.R. § 416.927(c)(1). With respect to State Agency physicians, ALJs "are not required to adopt any prior administrative medical findings, but they must consider this evidence … because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." *See* 20 C.F.R. § 416.913a(b)(1). Nevertheless, "it is not a *per se* error of law, as [claimant] suggests, for the ALJ to credit a nonexamining source over a nontreating source." *Norris v. Comm'r of Soc. Sec.*, 461 Fed. App'x 433, 439 (6th Cir. 2012); *accord Moscorelli*, 2016

WL 4486851 at *3.

Further, a recent decision from the Southern District of Ohio, with nearly identical facts, is instructive, wherein the claimant had no treating psychologist or psychiatrist and obtained her medication from her primary care physician. *See Lowther v. Comm'r of Soc. Sec.*, No. 2:15-cv-3010, 2016 WL 7111604 at *7 (S.D. Ohio, Dec. 7, 2016), *adopted by* 2017 WL 25551 (Jan. 2, 2017). The *Lowther* decision reasoned that "[b]ecause there was no medical source with a longitudinal picture of Plaintiff's mental health, each psychological medical source opinion necessarily was based on a limited amount of evidence." *Lowther*, 2016 WL 7111604 at *7. "Considering all of this," the court reasoned, "the ALJ's decision to place more weight on the conclusions" of a non-examining State Agency psychologist, who reviewed the record, than those of two consultative examining psychologists "was within the permissible 'zone of choice' afforded to an ALJ." *Id.* (citations omitted).

This court agrees with the sound reasoning of the *Lowther* decision, and finds that the ALJ did not err by assigning greater weight to the non-examining opinions of Drs. Rudy and Tischler, who had the benefit of reviewing the majority of the medical record—including the opinions of the consultative examiners. The ALJ adequately explained why he assigned less weight to Drs. Konieczny and House. The second assignment of error, therefore, is without merit.

## VI.   Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be AFFIRMED.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge

Date: May 26, 2017

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).